IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA25-130

Filed 7 January 2026

Wake County, No. 24CV013410-910
Randolph County, No. 23CVS001479-750

RANDOLPH COUNTY BOARD OF EDUCATION, ex rel. JONATHAN BURRIS, Plaintiff

v.

JOSH STEIN, in his official capacity as North Carolina Attorney General, NELS ROSELAND, in his official capacity as North Carolina Controller, ROY COOPER in his official capacity as North Carolina Governor, Defendants.

Appeal by Defendants from order entered 17 July 2024 by Judge A. Graham Shirley, II, in Wake County Superior Court. Heard in the Court of Appeals 9 September 2025.

> *Davis Hartman Wright, LLP, by R. Daniel Gibson, and Stam Law Firm, PLLC, by Paul Stam, for Plaintiff-Appellee.*

> *Attorney General Jeff Jackson, by Deputy Solicitor General James W. Doggett, Special Deputy Attorney General Matthew Tulchin, and Special Deputy Attorney General Laura H. McHenry, for Defendants-Appellants.*

COLLINS, Judge.

This appeal arises from Plaintiff's challenge to the Attorney General's Environmental Enhancement Grants Program, initiated pursuant to a 2000 Agreement between the Attorney General and Smithfield Foods. Defendants appeal the trial court's order granting Plaintiff summary judgment on his declaratory

judgment claims and denying Defendants' motion to dismiss. We reverse the trial court's order granting Plaintiff summary judgment.

## I. Procedural History

Plaintiff Jonathan Burris began this action in 2023 on behalf of the Randolph County Board of Education by filing a complaint in Randolph County superior court. Plaintiff asserted declaratory judgment claims against the Attorney General; the Controller; the Governor; the Chief Financial Officer at the Department of Justice ("DOJ"); and an Office of State Budget and Management ("OSBM") employee. The claims asserted that money paid for environmental enhancement pursuant to an Agreement between the Attorney General and Smithfield Foods, Incorporated, and certain of its subsidiaries ("Smithfield") had been unconstitutionally requisitioned by the named defendants and must be used exclusively for public schools.

The named defendants moved to dismiss the complaint or, in the alternative, to transfer the case to Wake County superior court. The Randolph County superior court concluded it lacked jurisdiction to address the named defendants' motion to dismiss, allowed their motion to transfer, and ordered the case transferred to Wake County. Plaintiff voluntarily dismissed his claims against the Chief Financial Officer at the DOJ and the OSBM employee.

Plaintiff moved for summary judgment and filed supporting exhibits. The remaining defendants—the Attorney General, the Controller, and the Governor (collectively, "Defendants")—renewed their motion to dismiss. Defendants also

submitted affidavits and exhibits in opposition to Plaintiff's motion for summary judgment.

The superior court denied Defendants' motion to dismiss and granted summary judgment to Plaintiff. The superior court "[d]eclare[d] that all funds received from Smithfield Foods after July 1, 2019 must be used for the purpose of environmental enhancement in public schools."

Defendants timely appealed the superior court's order to this Court.

## II. Factual Background

During the 1990s, lagoons in eastern North Carolina containing hog waste repeatedly ruptured or overflowed, pouring millions of gallons of hog waste into the State's waterways. *New Hanover Cnty. Bd. of Educ. v. Stein*, 380 N.C. 94, 96 (2022) (*Stein II*). As part of the response to this crisis, the Attorney General entered into an Agreement in 2000 with Smithfield, the state's largest hog-farming operation. *Id.* Under the Agreement, Smithfield agreed to undertake various measures to enhance the environment, including "commit $50 million to environmental enhancement activities[.]" To effectuate environmental enhancement activities with Smithfield's $50 million commitment, Smithfield agreed "to pay each year for 25 years an amount equal to one dollar for each hog in which the Companies . . . have had any financial interest in North Carolina during the previous year, provided, however, that such amount shall not exceed $2 million in any year."

Under the Agreement, "[t]he funds will be paid to such organizations or trusts as the Attorney General will designate" and "will be used to enhance the environment of the State, including eastern North Carolina, to obtain environmental easements, construct or maintain wetlands and such other environmental purposes, as the Attorney General deems appropriate." A portion of the funds may "be designated as grants to the State to defray the costs incurred by the State as a result of this Agreement, . . . in the discretion of the Attorney General." To administer the program, the Attorney General is authorized to consult with representatives from Smithfield, the North Carolina Department of Environmental Quality,[1] and "any other groups or individuals he deems appropriate and may appoint any advisory committees he deems appropriate."

With the Attorney General's consent, Smithfield entered into an escrow agreement with a private bank on 18 October 2002 wherein Smithfield "agreed to deposit all funds provided in accordance with the [A]greement" into an account at the bank. *Stein II*, 380 N.C. at 97. In January 2003, the Attorney General established the Environmental Enhancement Grants ("EEG") Program to "improv[e] the air, water and land quality of North Carolina by funding environmental projects that address the goals of the agreement between Smithfield and the Attorney General."

---

[1] At the time the Agreement was signed, what is now the North Carolina Department of Environmental Quality was known as the North Carolina Department of Environment and Natural Resources.

*Id.* at 97 (brackets omitted). The Attorney General then disbursed EEG funds from the escrow account to EEG Program recipients. *Id.* Most years, Smithfield deposited $2 million into the account around the anniversary of its entry into the Agreement. *Id.*

Between 2000 to 2016, the Attorney General awarded more than $25 million in grants pursuant to the Agreement to fund "more than 100 separate initiatives that addressed a variety of environmental problems," including "rehabilitating abandoned waste lagoons, conserving wildlife habitats, improving water quality, reducing pollution from agricultural and stormwater runoff, funding environmental research, and restoring forests, shorelines, wetlands, and streams across North Carolina." *Id.* at 98.

In 2016, the New Hanover County Board of Education and an individual taxpayer sued the Attorney General concerning the EEG Program. *See New Hanover Cnty. Bd. of Educ. v. Stein*, 374 N.C. 102 (2020) (*Stein I*). The plaintiffs alleged the payments made by Smithfield pursuant to the Agreement constituted civil penalties for purposes of Article IX, Section 7 of the North Carolina Constitution, *id.* at 105, which requires the "proceeds of all penalties and forfeitures and of all fines collected in the several counties for any breach of the penal laws of the State . . . [to be] faithfully appropriated and used exclusively for maintaining free public schools[,]" and allows the General Assembly to "place in a State fund the clear proceeds of all civil penalties, forfeitures, and fines" to "be faithfully appropriated by the General

Assembly . . . to be used exclusively for maintaining free public schools." N.C. Const. art. IX, § 7. Plaintiffs

> sought to have the Attorney General preliminarily and permanently enjoined from distributing monies received pursuant to the [A]greement to any recipient other than the Civil Penalty and Forfeiture Fund authorized by article IX, section 7(b) and N.C. [Gen. Stat.] §§ 115C-457.1 [to] -475.3 and requested that all monies distributed under the grant program within the last three years and all future payments received by the Attorney General be placed into the Civil Penalty and Forfeiture Fund.

*Stein I*, 374 N.C. at 106.

In 2020, the individual taxpayer's complaint was dismissed because he lacked standing. *Id.* at 110. Addressing the merits of the New Hanover County Board of Education's argument, our Supreme Court concluded that the Attorney General was entitled to summary judgment because "the payments contemplated by the [A]greement did not constitute penalties for purposes of article IX, section 7." *Id.* at 123.

In 2019, while the New Hanover County Board of Education's lawsuit was pending, the General Assembly enacted N.C. Gen. Stat. § 147-76.1, providing that "all funds received by the State, including cash gifts and donations, shall be deposited in the State treasury." N.C. Gen. Stat. § 147-76.1(b) (2019). The statute further provides that "the terms of an instrument evidencing a cash gift or donation are a binding obligation of the State" and that "[n]othing in this section shall be construed to supersede, or authorize a deviation from the terms of an instrument evidencing a

gift or donation setting forth the purpose for which the funds may be used." *Id.* § 147-76.1(c) (2019).

In or around July 2020, Matthew Longobardi, the Chief Financial Officer at the DOJ, contacted OSBM to effectuate the transfer of EEG funds received in 2019 and being held in the escrow account into the State treasury and to prepare for the 2020 EEG funds to be deposited into the State treasury. Mr. Longobardi asked OSBM to create a fund code for the receipt and distribution of the EEG funds.

Under the State Budget Act, funds held in the State treasury are assigned a "nine-digit fund code." N.C. Gen. Stat. § 143C-1-1(d)(23) (2024). The first five digits of the fund code comprise the "budget code." Off. of State Budget & Mgmt., Budget Manual § 3.4.1 (2025) ("Manual"), https://tinyurl.com/4v3np65z (last visited Dec. 11, 2025). This budget code assigns a "fund type" to funds "to ensure proper financial statement reporting." *Id.*; *see also* N.C. Gen. Stat. § 143C-1-3 (2024). The last four digits of the fund code[2] designate the "specific activity" that funds will be used to "support." *Id.* § 143C-1-1(d)(23); *see also* Manual § 3.4.2.

Mr. Longobardi asked OSBM to assign budget code "23606," a dormant DOJ interest-bearing treasury account that had once been used to hold seized and forfeited assets, because the EEG funds needed to be deposited into an interest-bearing

---

[2] After the enactment of the budgets at issue in this case, the State adopted a new accounting system (the North Carolina Financial System). Under this new system, six additional digits now complete a fund code rather than four. *See* Manual § 3.4.2.

account. The budget code reflected the "fund type" of the EEG moneys as "[s]pecial [r]evenue [f]unds." *Id.* § 143C-1-3(a)(4). Special revenue funds are "proceeds of specific revenue sources . . . that are legally restricted to expenditure for specified purposes." *Id.*[3]

Mr. Longobardi asked OSBM to assign "2204" as the last four digits of the fund code, designating "Smithfield Environment Enhancement Grants" as the specific activity that funds will be used to support. The North Carolina Integrated Budget Information System document that created 23606-2204 as the nine-digit fund code indicated the fund was to "be used to account for the receipt of funds and distribution of reimbursements to grantees awarded funds from the original Smithfield agreement from 2000 and any subsequent modifications to that agreement." The document also indicated that "[p]ayments are restricted per the terms of the agreement and are to be used for environmental enhancement grants . . . ."

After the EEG funds were assigned their fund code, the Attorney General transferred the single payment that had been received from Smithfield prior to 1 July 2019 into the State treasury and committed to ensuring that all future payments received from Smithfield would be deposited into the State treasury. *Stein II*, 380 N.C. at 101.

---

[3] *See also* Off. of State Controller, NCAS Chart of Accounts, Budget Codes (2023) (designating budget code 23606 as a special revenue fund), https://tinyurl.com/mvxe8wu6 (last visited Dec. 11, 2025).

In the Governor's recommended budget for fiscal years 2021-22 and 2022-23, as required by N.C. Gen. Stat. § 143C-3-5(a), the Governor proposed that the EEG funds for that biennium be spent by "090-Department of Justice" pursuant to fund code 23606-2204, and specifically to budget code "23606-Justice - Seized and Forfeited Assets" and fund type "2204" to support "Smithfield Environment Enhancement Grants." The General Assembly enacted this proposal without modification. *See* Current Operations Appropriations Act of 2021, 2021 N.C. Sess. Laws 180, S.B. 105, § 4.1(a).

In the Governor's recommended budget for fiscal years 2023-24 and 2024-25, the Governor again proposed that the EEG funds received in that biennium be spent by "090-Department of Justice" pursuant to fund code 23606-2204, and specifically to budget code "23606-Justice - Seized and Forfeited Assets" and fund type "2204" to support "Smithfield Environment Enhancement Grants." The General Assembly enacted this proposal without modification. *See* Current Operations Appropriations Act of 2023, 2023 N.C. Sess. Laws 134, H.B. 259, § 4.1(a).

## III. Discussion

Defendants argue that the trial court erred by granting summary judgment to Plaintiff and not to Defendants on all claims. Defendants first argue that Plaintiff lacks standing to sue. Defendants further argue that even if Plaintiff has standing, the trial court erred by concluding that the civil penalty clause and the appropriations clause of our North Carolina Constitution required the EEG funds for the fiscal years

2021-25 be used exclusively for public schools. Defendants also argue that the trial court erred by concluding that the appropriations clause and the gift clause required the EEG funds for the fiscal years 2019-21 be used exclusively for public schools.

**A. Standard of Review**

We review the grant or denial of summary judgment de novo. *Variety Wholesalers, Inc. v. Salem Logistics Traffic Servs., LLC*, 365 N.C. 520, 523 (2012). Generally, "findings of fact and conclusions of law are not required in the determination of a motion for summary judgment, and if these are made, they are disregarded on appeal." *Carmichael v. Lively*, 235 N.C. App. 222, 228 (2014) (quotation marks and citation omitted).

Summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that any party is entitled to a judgment as a matter of law." N.C. Gen. Stat. § 1A-1, Rule 56(c) (2024). "When appropriate, summary judgment may be rendered against the party moving for such judgment." *Blades v. Raleigh*, 280 N.C. 531, 544 (1972). In ruling on a summary judgment motion, a trial court must "consider the evidence in the light most favorable to the non-movant, drawing all inferences in the non-movant's favor." *Morrell v. Hardin Creek, Inc.*, 371 N.C. 672, 680 (2018) (citation omitted).

"We review constitutional questions de novo." *State ex rel. McCrory v. Berger*, 368 N.C. 633, 639 (2016) (citation omitted). In analyzing constitutional questions,

"we look to the text of the constitution, the historical context in which the people of North Carolina adopted the applicable constitutional provision, and our precedents." *Id*. (citations omitted).

## B. Standing

Defendants first argue that the trial court erred by granting summary judgment to Plaintiff and not to Defendants because Plaintiff lacks standing to sue.

"A plaintiff must establish standing in order to assert a claim for relief." *United Daughters of the Confederacy v. City of Winston-Salem*, 383 N.C. 612, 625 (2022) (citations omitted). "As a general matter, the North Carolina Constitution confers standing on those who suffer harm." *Id.* (quotation marks and citation omitted).

A taxpayer may sue on behalf of a political subdivision when the political subdivision refuses the taxpayer's demand to sue. *See Branch v. Bd. of Ed. of Robeson Cnty.*, 233 N.C. 623, 625 (1951). A school board is a political subdivision. *Id.* A taxpayer may sue on behalf of a school board to recover funds wrongfully diverted from that school board when he is a taxpayer of that school board's district. *Guilford Cty. Bd. of Comm'rs v. Trogdon*, 124 N.C. App. 741, 747 (1996).

"[W]here a plaintiff undertakes to bring a taxpayer's suit on behalf of a . . . political subdivision, his complaint must disclose that he is a taxpayer of the . . . subdivision." *Branch*, 233 N.C. at 626 (citing *Hughes v. Teaster*, 203 N.C. 651 (1932) (other citations omitted)). Additionally, the plaintiff's complaint must allege facts

sufficient to establish either "(a) [t]hat there has been a demand on and refusal by the proper authorities to institute proceedings for the protection of the interests of the public agency or political subdivision[;] . . . or (b) that such a demand on such authorities would be useless." *Id.* (citations omitted).

Here, Plaintiff's amended complaint alleges, "Burris is a citizen and taxpayer of Randolph County who made a demand on the Randolph County Board of Education to file this action. The Randolph County Board of Education *wrongfully* refused to file this action." The record reflects that Plaintiff's attorneys sent a letter to the Chair of the Randolph County Board of Education styled as "a demand for litigation under *Branch v. Bd. of Educ. . . .*" The letter states that "[t]he Attorney General and Governor are diverting taxpayer funds that rightly belong to public schools, including the Randolph County Board of Education" and asserts that "[f]iling suit to stop that diversion would protect the interests" of the Board. The letter further states, "Our client, Jonathan Burris, is a taxpayer and resident of Randolph County" who "requests that you bring suit on these claims."

The Board adopted a resolution at its meeting on 29 June 2023, stating it had "reviewed a proposed complaint and fee agreement drafted by Jonathan Burris' counsel" and "denie[d] Mr. Burris' request to engage in litigation . . . ."

Plaintiff has established standing to bring this suit under *Branch v. Bd. of Ed. of Robeson Cnty.*, and the trial court correctly concluded as such.

**C. Fiscal years 2021-25**

Defendants argue that the trial court erred by granting summary judgment in Plaintiff's favor, and not in Defendants' favor, with respect to the EEG funds for fiscal years 2021-25, under the civil penalties clause and the appropriations clause.

### 1. *Civil penalties clause*

North Carolina Constitution Article IX, Section 7, titled "County school fund; State fund for certain moneys[,]" provides as follows:

> (a) Except as provided in subsection (b) of this section, all moneys, stocks, bonds, and other property belonging to a county school fund, and the clear proceeds of all penalties and forfeitures and of all fines collected in the several counties for any breach of the penal laws of the State, shall belong to and remain in the several counties, and shall be faithfully appropriated and used exclusively for maintaining free public schools.

> (b) *The General Assembly may place in a State fund the clear proceeds of all civil penalties, forfeitures, and fines which are collected by State agencies and which belong to the public schools pursuant to subsection (a) of this section.* Moneys in such State fund shall be faithfully appropriated by the General Assembly, on a per pupil basis, to the counties, to be used exclusively for maintaining free public schools.

N.C. Const. art. IX, § 7 (emphasis added).

Article IX, Section 7 is implemented by N.C. Gen. Stat. §§ 115C-457.1 to -457.3. *See N.C. Sch. Bds. Ass'n v. Moore*, 359 N.C. 474, 512 (2005). Section 115C-457.1 creates the Civil Penalty and Forfeiture Fund allowed by Article IX, Section 7:

> (a) There is created **the Civil Penalty and Forfeiture Fund**. **The Fund** shall consist of the clear proceeds of all civil penalties, civil forfeitures, and civil fines that are

collected by a State agency and that the General Assembly is authorized to place in a State fund pursuant to Article IX, Section 7(b) of the Constitution.

(b) **The Fund** shall be administered by the Office of State Budget and Management. **The Fund** and all interest accruing to **the Fund** shall be faithfully used exclusively for maintaining free public schools.

N.C. Gen. Stat. § 115C-457.1 (2024) (emphasis added).

The process of remitting "the clear proceeds" described in Article IX, Section 7 to the Civil Penalty and Forfeiture Fund is governed by Section 115C-457.2:

The clear proceeds of all civil penalties, civil forfeitures, and civil fines that are collected by a State agency and that the General Assembly is authorized to place in a State fund pursuant to Article IX, Section 7(b) of the Constitution shall be remitted to the Office of State Budget and Management by the officer having custody of the funds within 10 days after the close of the calendar month in which the revenues were received or collected. Notwithstanding any other law, all such funds shall be deposited in the Civil Penalty and Forfeiture Fund. . . .

N.C. Gen. Stat. § 115C-457.2 (2024).

Funds deposited into the Civil Penalty and Forfeiture Fund must be appropriated to the State Public School Fund in the Current Operations Appropriations Act, as prescribed in Section 115C-457.3:

The General Assembly shall appropriate moneys in the Civil Penalty and Forfeiture Fund in the Current Operations Appropriations Act. These appropriations shall be made to the State Public School Fund for allotment by the State Board of Education, on behalf of the counties, to local school administrative units on a per pupil basis in accordance with Article IX, Section 7(b) of the North

- 14 -

Carolina Constitution.

N.C. Gen. Stat. § 115C-457.3(a) (2024).

The parties do not contest that, pursuant to the North Carolina Supreme Court's decision in *Stein I,* "the payments contemplated by the [A]greement did not constitute penalties for purposes of article IX, section 7." *Stein I*, 374 N.C. at 123. Accordingly, the payments received from Smithfield pursuant to the Agreement were not required to be deposited into the Civil Penalty and Forfeiture Fund to be "faithfully appropriated by the General Assembly" to the State Public School Fund and "used exclusively for maintaining free public schools." N.C. Const. art. IX, § 7.

Plaintiff argues that "[t]he only appropriation for fiscal years 2021-2025 is to 'seized and forfeited assets,' an appropriation to an Article IX forfeiture fund." Accordingly, Plaintiff argues, the payments received from Smithfield pursuant to the Agreement for those years must be used exclusively for public schools.

Plaintiff erroneously conflates the "23606-Justice - Seized and Forfeited Assets" account, designated by OSBM to receive the EEG funds and to which the General Assembly appropriated the funds, with the Civil Penalty and Forfeiture Fund allowed by Article IX, Section 7 and implemented by N.C. Gen. Stat. § 115C-457.1. True, both include a word derived from "forfeit." This shared root does not, however, transform the "23606-Justice - Seized and Forfeited Assets" account into the Civil Penalty and Forfeiture Fund allowed by the Constitution and implemented by statute, or vice versa.

Because the funds were not placed into the Civil Penalty and Forfeiture Fund authorized by Article IX, Section 7 and N.C. Gen. Stat. §§ 115C-457.1 to -475.3, the trial court erred by concluding that the EEG funds must be used exclusively for public schools.

### 2. *Appropriations clause*

Defendants next contend that, "[t]o the extent that the superior court indirectly accepted [Plaintiff's] claim under the appropriations clause in resolving his civil-penalty claim, then his appropriations claim would also fail . . . ."

Article V, Section 7 provides that "[n]o money shall be drawn from the State treasury but in consequence of appropriations made by law[.]"  N.C. Const. art. V, § 7(1).  The appropriations clause is further operationalized by the State Budget Act, which provides that "[n]o State agency or non-State entity shall expend any State funds except in accordance with an act of appropriation and the requirements of [the State Budget Act]."  N.C. Gen. Stat. § 143C-1-1(b) (2024).  An appropriation is "[a]n enactment by the General Assembly authorizing the withdrawal of money from the State treasury."  N.C. Gen. Stat. § 143C-1-1(d)(1) (2024).

Plaintiff's claim under the appropriations clause alleged that there were "no 'appropriations made by law' for the drawing of Agreement funds" for 2021 through 2025, and that "[b]y drawing or abetting the drawing of Agreement funds from the State treasury without an appropriation, Defendants have violated Article V of the North Carolina Constitution and Chapter 143C of the General Statutes."

- 16 -

Plaintiff consistently argues, however, that the General Assembly *did* appropriate the funds for fiscal years 2021-25. The parties do not disagree that the funds were appropriated to "23606-Justice - Seized and Forfeited Assets." Plaintiff's appropriations clause argument is another way of asserting his civil penalty clause argument – to wit, because the EEG funds were appropriated to "an Article IX forfeiture fund," the funds must have been used exclusively for public schools.

As explained above, the EEG funds were not placed into the Civil Penalty and Forfeiture Fund authorized by Article IX, Section 7 and implemented by N.C. Gen. Stat. §§ 115C-457.1 to -475.3, and the trial court thus erred by concluding that the EEG funds must be used exclusively for public schools. Accordingly, Plaintiff's appropriations clause argument fails as well.

**D. Plaintiff's claims with respect to fiscal years 2019-21**

Defendants argue that the trial court erred by granting summary judgment to Plaintiff, and not to Defendants, on Plaintiff's claim for fiscal years 2019-21 under the gift clause of Article IX, Section 6 and the appropriations clause of Article V, Section 7.

*1. Gift clause*

Article IX, Section 6 of the North Carolina Constitution, titled "State school fund[,]" provides in full:

> [(1)] The proceeds of all lands that have been or hereafter
> may be granted by the United States to this State, and not
> otherwise appropriated by this State or the United States;

- 17 -

[(2)] all moneys, stocks, bonds, and other property belonging to the State for purposes of public education; [(3)] the net proceeds of all sales of the swamp lands belonging to the State; and [(4)] *all other grants, gifts, and devises that have been or hereafter may be made to the State, and not otherwise appropriated by the State or by the terms of the grant, gift, or devise*, shall be paid into the State Treasury and, together with so much of the revenue of the State as may be set apart for that purpose, shall be faithfully appropriated and used exclusively for establishing and maintaining a uniform system of free public schools.

N.C. Const. art. IX, § 6.

Article IX, Section 6 "delineates four categories of monies that are contained within the 'State school fund' and provides that each of these four [categories of monies] 'shall be paid into the State Treasury' and 'shall be faithfully appropriated and used exclusively for establishing and maintaining a uniform system of free public schools.'" *Cooper v. Berger*, 376 N.C. 22, 39 (2016). The gift clause in Article IX, Section 6 applies only to gifts "not otherwise appropriated by the State or by the terms of the grant, gift, or devise[.]" N.C. Const. art. IX, § 6. The gift clause "is intended to ensure that any *general* grants, gifts, and devises that are received by the State and are *not intended for any other purpose* shall be spent for educational purposes . . . ." *Cooper*, 376 N.C. at 39 (emphasis added).

Consistent with the gift clause, the General Assembly mandates that "the terms of an instrument evidencing a cash gift or donation are a binding obligation of the State[,]" and that Section 147-76.1 "shall [not] be construed to supersede, or

authorize a deviation from the terms of an instrument evidencing a gift or donation setting forth the purpose for which the funds may be used." N.C. Gen. Stat. § 147-76.1(c).

Smithfield's gift to the State is not a general gift that was not intended for any other purpose and, thus, is not subject to the gift clause. Instead, the terms of the Agreement expressly direct Smithfield's gift to "be paid to such organizations or trusts as the Attorney General will designate" to be used "to enhance the environment of the State, including eastern North Carolina, to obtain environmental easements, construct or maintain wetlands and such other environmental purposes, as the Attorney General deems appropriate."

Given the General Assembly's mandate and the specific terms of the Agreement, the gift clause does not require the EEG funds to be used exclusively for public schools. The trial court erred in holding otherwise.

### 2. *Appropriations clause*

The appropriations clause provides that "[n]o money shall be drawn from the State treasury but in consequence of appropriations made by law[.]" N.C. Const. art. V, § 7. The gift clause provides that "grants, gifts, and devises . . . made to the State, and not otherwise appropriated by the State or by the terms of the grant, gift, or devise" be "faithfully appropriated" and used exclusively for public schools. N.C. Const. art. IX, § 6.

Plaintiff argues that the gift clause "creates a default rule when the General

Assembly does not exercise [its] appropriation authority." Because "[t]he General Assembly did not appropriate funds in 2019-2021," the gift clause "requires those funds to go to public education."

The gift clause applies only to gifts "not otherwise appropriated by the State or by the terms of the grant, gift, or devise[.]" N.C. Const. art. IX, § 6. The terms of the Agreement expressly require Smithfield's gift to "be paid to such organizations or trusts as the Attorney General will designate" to be used "to enhance the environment of the State, including eastern North Carolina, to obtain environmental easements, construct or maintain wetlands and such other environmental purposes, as the Attorney General deems appropriate." N.C. Gen. Stat. § 147-76.1(c) mandates such terms be binding obligations of the State. As the General Assembly mandates the EEG funds be used according to the terms of Smithfield's gift, any constitutional "default rule" does not apply. The trial court thus erred in redirecting the 2019-21 EEG funds to be used exclusively for public schools.

## E. Future funds

Defendants also argue that the trial court erred by ordering that "*all* funds received from Smithfield Foods after July 1, 2019 must be used for the purpose of environmental enhancement in public schools." (emphasis added). Defendants argue that the theories on which the trial court granted Plaintiff relief "depend on how funds received in the past were treated in the past" and "that treatment might not reoccur" in the future.

We agree that to the extent the trial court's order reaches funds beyond fiscal years 2024-25, the order is erroneous. We thus clarify that the judgment does not and cannot extend to future payments beyond those fiscal years.

## IV.    Conclusion

For the reasons stated herein, the trial court's order granting summary judgment in Plaintiff's favor is reversed and remanded to the trial court for entry of summary judgment in Defendants' favor.

REVERSED AND REMANDED.

Judges CARPENTER and FLOOD concur.